**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

M.B., a minor, by and through her mother
and next friend, RAQUEL CURTIS,

T.W., a minor, by and through his
grandfather and next friend, DEXTER ALSOBROOK,

K.M., a minor, by and through his
mother and next friend, KANTON MATHIS,

Plaintiffs,

v.

DEKALB COUNTY SCHOOL DISTRICT;
DEKALB COUNTY BOARD OF EDUCATION;
ADAM CHRISTOPHER SMITH, individually;
JAMES HOLLOWAY, individually and in his
official capacity as Principal of Cedar Grove
Middle School; and MEGAN HUTCHINSON,
individually,

Defendants.

Civil Action No. ____________________

## COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW Plaintiff M.B., a minor, by and through her mother and next friend, Raquel Curtis, Plaintiff T.W., a minor, by and through his father and next friend, Dexter Alsobrook, and Plaintiff K.M., a minor, by and through his mother and next friend, Kanton Mathis, and file this Complaint against Defendants DeKalb County School District ("the District"), DeKalb County Board of Education ("the Board"), Adam Christopher Smith ("Smith"), James Holloway ("Holloway"), and Megan Hutchinson ("Hutchinson"), and in support show the Court as follows:

## NATURE OF THE ACTION

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, together with pendent claims under Georgia law, arising from the repeated physical abuse of a twelve-year-old sixth-grade student by her teacher and football coach, Defendant Adam Christopher Smith, under the guise of in-class "games," and from the District's and its administrators' knowledge of, facilitation of, and deliberate indifference to that abuse and to the retaliatory bullying and death threats Plaintiff M.B. suffered after she came forward.

2. Plaintiff M.B. was struck on her hand and leg with a wooden yardstick by Smith during regular classroom instruction at Cedar Grove Middle School. This was not an isolated act of discipline; it was part of a recurring practice, referred to by students and by Smith himself as "Mr. Smith Games," in which Smith covered his classroom's door window, turned off the lights, forced students to run timed races or answer rapid-fire questions, and struck those who lost or answered incorrectly with a yardstick, while also kicking, dousing students with water, and publicly humiliating them.

3. Cedar Grove Middle School’s own campus supervisor routinely escorted student-athletes, including students who were not in Smith’s class, to Smith’s classroom to be physically disciplined, and was present in the room while Smith struck and yelled at students, according to the District’s own internal investigative memorandum. The District later issued that campus supervisor a Notice of Termination after concluding she had failed to report child abuse, render aid, and cooperate in its investigation.

4. After M.B.’s mother reported the abuse in writing on March 31, 2025, with video and audio evidence, the District placed Smith on administrative leave, but its principal, Defendant Holloway, recommended only a five-day suspension notwithstanding the video evidence, and represented to District administration that he had been unaware of the practice despite his own campus supervisor’s participation in it. Smith’s teaching certificate was later suspended by the Georgia Professional Standards Commission, and he resigned his position.

5. In the weeks that followed, and because Smith was a popular coach who had led the school's football team to championships, M.B. was ostracized, bullied, and threatened by fellow students for her role in his removal, including a specific threat, communicated to her and reported to Principal Holloway, that another student intended to “stab [her] to death.” M.B. was also treated dismissively and punitively by some Cedar Grove staff after her role became known. M.B. was ultimately withdrawn from in-person instruction and placed in virtual learning for the remainder of the school year, and has since been diagnosed with Post-Traumatic Stress Disorder and Major Depressive Disorder as a direct and proximate result of these events.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over Plaintiffs' claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

7. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise out of the same case or controversy as Plaintiffs' federal claims and form part of the same nucleus of operative fact.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in DeKalb County, Georgia, which lies within the Atlanta Division of the Northern District of Georgia, and because Defendants reside or are located within this District.

## PARTIES

9. Plaintiff M.B. is a minor child who, at all times relevant to this Complaint, resided with her mother, Raquel Curtis, in Decatur, DeKalb County, Georgia, and attended Cedar Grove Middle School as a sixth-grade student. She brings this action by and through her mother and next friend, Raquel Curtis.

10. Plaintiff T.W. is a minor child who, at all times relevant to this Complaint, attended Cedar Grove Middle School, first enrolling in the sixth grade during the 2023-2024 school year and continuing through the 2025-2026 school year, and who was subjected to physical abuse by Defendant Smith as described herein. He brings this action by and through his grandfather and next friend, Dexter Alsobrook.

11. Plaintiff K.M. is a minor child who, at all times relevant to this Complaint, attended Cedar Grove Middle School as a sixth-grade student during the 2024-2025 school year and was

subjected to physical abuse by Defendant Smith as described herein. He brings this action by and through his mother and next friend, Kanton Mathis.

12. Defendant DeKalb County School District is a political subdivision of the State of Georgia, organized and existing under the laws of the State of Georgia, and is the local school district responsible for the operation of Cedar Grove Middle School and the employment, training, and supervision of its administrators, teachers, and staff, including Defendants Smith, Holloway, and Hutchinson. The District may be served with process on its Superintendent and/or Chief Legal Officer.

13. Defendant DeKalb County Board of Education is the elected governing body that operates the DeKalb County School System and exercises authority over the District, including final policymaking authority over the hiring, training, supervision, and discipline of District personnel and the safety of students, and is a body corporate subject to suit under Georgia law. The Board may be served with process through its Chair and/or Secretary. Plaintiffs plead the District and the Board as separate Defendants, and, to the extent the law treats them as a single entity, in the alternative. Unless otherwise indicated, references in this Complaint to "the District" include the Board.

14. Defendant Adam Christopher Smith was, at all times relevant to this Complaint, employed by the District as an English Language Arts teacher and as the football coach at Cedar Grove Middle School, acting under color of state law within the meaning of 42 U.S.C. § 1983. He is sued in his individual capacity. Upon information and belief, Smith's most recent known address is 10802 Wellington Drive, Covington, Georgia 30014.

15. Defendant James Holloway was, at all times relevant to this Complaint, the Principal of Cedar Grove Middle School and a supervisory employee of the District, acting under color of state law within the meaning of 42 U.S.C. § 1983. He is sued in his individual capacity for his own deliberate indifference and failure to supervise, train, and protect, and in his official capacity to the extent injunctive or declaratory relief is sought against the office he holds.

16. Defendant Megan Hutchinson was, at all times relevant to this Complaint, employed by the District's Department of Public Safety as a campus supervisor assigned to Cedar Grove Middle School, acting under color of state law within the meaning of 42 U.S.C. § 1983. She is sued in her individual capacity.

**CONDITIONS PRECEDENT / ANTE LITEM NOTICE**

17. On April 15, 2025, undersigned counsel's office served written ante litem notice, by certified mail, return receipt requested, pursuant to O.C.G.A. § 36-11-1 and applicable Georgia law, upon the DeKalb County Chief Executive Officer, the DeKalb County School District Chief Legal Officer, DeKalb County School District Superintendent Dr. Devon Horton, and Cedar Grove Middle School Principal James Holloway, on behalf of M.B. and the additional prospective claimants named therein, setting forth the factual basis of the claims described in this Complaint and demanding damages.

18. More than the statutorily required period has elapsed since that notice was served, and Plaintiffs have received no response disputing the sufficiency of the notice. All conditions precedent to the assertion of Plaintiffs' state-law claims against the District and the Board have therefore been satisfied or, in the alternative, waived.

## FACTUAL ALLEGATIONS

**A. Smith's Pattern of Physical Abuse in the Classroom**

19. At all times relevant to this Complaint, Smith taught sixth-grade English Language Arts at Cedar Grove Middle School and also served as the school's football coach. Smith was popular among students and staff, in substantial part because of his success coaching the school's football team to championships.

20. During the 2024-2025 school year, and on information and belief for some period before it, Smith engaged students in what he and students referred to as "Mr. Smith Games" or "Smith games." As part of this practice, Smith would cover the window in his classroom door with paper, turn off the classroom lights, and tell students they were going to play a game. Games included having students run timed laps around the classroom or answer rapid academic questions, with the losing student, or a student who answered incorrectly, struck by Smith with a wooden yardstick.

21. This practice was not limited to M.B.'s class or the 2024-2025 school year. Witness accounts collected from M.B., T.W., and K.M. independently and consistently describe Smith closing his classroom blinds, having students assume plank positions or "wall sits" against a wall, and striking students on the hand, leg, foot, or shoulder with a yardstick when they lost a game, stopped early, or otherwise failed to comply, across at least the 2023-2024 and 2024-2025 school years.

22. Some of this conduct was captured on video by students themselves. A student identified as Alexia Avery is understood to have secretly recorded at least one such incident, and Smith began disciplining students who he learned had recorded him once he became aware of the practice. In at least one recording, Smith can be heard telling a student that if the

student moved to avoid a blow he would "have a problem," then instructing the student to remove his hoodie and assume a plank position on the floor before striking him with the yardstick and kicking him while telling him not to move "or it would get worse."

23. M.B., T.W., and K.M. did not report this abuse to school administrators for a substantial period because Smith told them, falsely, that their parents had given him written permission to physically discipline them, and because he separately told students that recording was prohibited in his classroom. Additionally, M.B., T.W., and K.M. knew that other teachers and school officials were already aware of Smith's behavior, as teachers would send or threaten to send, unrulily students to Smith. Lastly, the students also feared social retaliation from peers who liked Smith and feared removal from the football team or other reprisal if they came forward; T.W. in particular did not tell his family what Smith had done to him for fear of being kicked off the football team.

**B. The District's Knowledge and Facilitation of the Abuse**

24. Cedar Grove Middle School's campus supervisor, Defendant Megan Hutchinson, along with other security personnel, routinely escorted student-athletes, including students who were not enrolled in Smith's class, to Smith's classroom to be disciplined by Smith. This practice was known to and observed by other students and staff, and constituted a de facto referral system by which Cedar Grove staff funneled students to Smith for physical punishment outside any lawful disciplinary process.

25. At least one teacher at Cedar Grove, identified by M.B. as Ms. Flanigan, told students in her own classroom that misbehaving students would be sent to "Mr. Smith's class," reflecting that Smith's use of physical discipline was a known and accepted practice among Cedar Grove staff, not a secret confined to Smith's own classroom.

26. According to the District's own internal memorandum, dated April 1, 2025, from Area Superintendent Jacqueline Taylor to the District's Office of Employee Relations, one of the video recordings submitted by Ms. Curtis "show[ed] the Campus Supervisor standing in the classroom with Mr. Smith while he hit and yell at the students," directly implicating District personnel, on information and belief Defendant Hutchinson, as present for and a passive or active participant in the abuse.

27. That same memorandum reflects that Principal Holloway told the Area Superintendent's office that he was "unaware of these incidents, including the Campus Supervisors sending students to Mr. Smith for punishment." Given the pervasiveness of the practice among students, its acknowledgment by at least one other teacher, and the direct participation of his own campus supervisor, Holloway knew or, in the exercise of reasonable supervisory diligence over his own school, should have known of Smith's practice well before March 31, 2025.

28. Principal Holloway's own account to the District's Department of Public Safety confirms the practice was understood at Cedar Grove. According to Public Safety Case No. 202504010001, Holloway stated that he believed the two football players shown in the videos had been escorted to Smith's classroom by a campus supervisor because Smith was the football coach, and that the incident took place late in 2024 during football season. In a written statement Holloway provided to Public Safety, Hutchinson stated that Smith disciplined students in his own way and that the students' parents had an understanding about the consequences he imposed.

29. On April 21, 2025, a Cedar Grove football player identified in one of the videos told Public Safety investigators that, during the prior football season, after he was talking in class, a campus supervisor came to his classroom and took him to Smith's classroom, where Smith made him and others wait and then do push-ups and sit-ups before sending them back to class.

30. On April 2, 2025, the District's Employee Relations office wrote to Public Safety that, in one of the videos, Hutchinson "can be seen in the video watching the Teacher hit the students for punishment," that it was alleged she was escorting students to the teacher's classroom for punishment, and directed that she be placed on administrative leave with pay. She was placed on leave that day.

31. At all relevant times, the District maintained Board Policies regarding corporal punishment. On information and belief, that policy permits physical restraint of a student only where there is immediate danger and after less intensive interventions have been attempted, and does not permit the use of physical force as discipline or punishment.

32. On information and belief, Board Policies also require that District staff receive approved training before using physical restraint, and requires schools to maintain training records and participant lists. On information and belief, the District did not provide Smith, Hutchinson, or Holloway with such training and did not maintain such records for them.

33. Georgia Department of Education rule Ga. Comp. R. & Regs. r. 160-5-1-.35 likewise restricts physical restraint of students to situations of immediate danger.

34. Smith's striking and kicking of students with a yardstick and his feet, as part of games and as punishment, was not a response to immediate danger and was not a lawful use of restraint

under the District's policy or Georgia law. It was punishment of the kind those authorities do not permit.

35. A separate contemporaneous report to the District's School Social Work Department, dated April 1, 2025, documents a different Cedar Grove sixth-grader's independent account that Smith turned off the classroom lights, covered the door window, sprayed water on students, had students run and answer questions to determine who would be struck, and struck that student on the leg and hand with a ruler, corroborating M.B.'s account of the same general practice.

36. At least one other Cedar Grove teacher, identified by T.W. and K.M. as a health teacher and assistant coach referred to as "Coach Southerland," also sent football players to Smith's classroom, understanding that Smith would make them run or perform physical exercises as discipline. This corroborates that Smith's role as an informal disciplinary destination for students, including students not in his own class, was known among Cedar Grove staff generally and not confined to Defendant Hutchinson.

**C. Smith's Abuse of M.B.**

37. On or about March 21, 2025, (the "March Incident"), during class, Smith directed students, including M.B., to participate in a Smith game that involved running around the classroom. M.B. lost the game. After M.B. sat back down at her seat, Smith struck her once on her right hand with a yardstick, causing her pain. Smith then walked around the classroom and struck other students before returning to strike M.B. a second time, on her left leg, with the yardstick.

**D. Smith's Abuse of T.W.**

38. T.W. attended Cedar Grove Middle School beginning in the sixth grade during the 2023-2024 school year, when Smith was his ELA teacher, and continued as a student athlete on the football team Smith coached during the 2024-2025 school year (seventh grade).

39. In the fall of 2024, Smith took a group of football players, including T.W., to an area behind the school, out of view of any security cameras, after some members of the team had gotten in trouble, and, applying a collective-punishment approach, made the players run and struck their shins, including T.W.'s, causing a visible mark on his shin. T.W. did not report this to his family at the time out of fear of being removed from the football team.

40. On a separate occasion, Smith punished T.W. by making him hold a "wall sit" position for the duration of a class period, apparently in response to the football team's losses. T.W. came home upset that day and told his grandmother he no longer wanted to play football, without explaining why; the reason did not come to light until later, when the broader pattern of Smith's conduct became known.

41. T.W. and his family learned of the broader scope of Smith's conduct toward other students, including M.B., in approximately March or April 2025, when neighbors including M.B.'s mother shared what had happened. It was in the course of that conversation that T.W. first disclosed to his family that he, too, had been struck by Smith.

42. T.W. subsequently wrote and submitted a witness statement to Principal Holloway, but Holloway did not make time to meet with T.W. directly regarding the statement.

**E. Smith's Abuse of K.M.**

43. K.M. attended Cedar Grove Middle School as a sixth-grade student during the 2024-2025 school year, with Smith as his ELA teacher, before relocating with his family and enrolling elsewhere for the following school year.

44. Around March 2025, during a class period in which Smith's entire ELA rotation, not just K.M.'s section, participated in Smith's games, Smith had students catch a thrown ball and, separately, required students not to laugh or react during a video. K.M. laughed and was struck once on the shoulder with a yardstick over his hoodie; at least three other students in the same class period were struck in the same manner that day.

45. K.M. also personally witnessed, on more than one occasion, unnamed eighth-grade teachers sending football players who were not enrolled in Smith's class to Smith's classroom, where Smith required them to hold plank positions and struck their foot or leg with a ruler or yardstick if they stopped.

46. K.M. did not seek, and his family did not pursue, medical treatment or counseling in connection with this incident.

## F. The March 31, 2025 Complaint and the District's Response

47. On March 31, 2025, Ms. Curtis submitted a formal written complaint to DeKalb County Schools Superintendent Dr. Devon Horton and to Cedar Grove Middle School administration, detailing the March Incident and the broader pattern of abuse, and enclosing supporting evidence, including a video recording of Smith striking and kicking students, recorded and transcribed conversations with four other students and their parents, and screenshots documenting Smith's role at the school. Ms. Curtis requested that M.B. be immediately removed from Smith's classroom, that Smith be placed on immediate

administrative leave, that a formal and impartial investigation be conducted, and that the role of school security personnel in escorting students to Smith's classroom be reviewed.

48. That same day, Area Superintendent Jacqueline Taylor acknowledged receipt of the complaint in writing and represented that the District would conduct a thorough investigation.

49. On April 1, 2025, the District's Office of Employee Relations opened an Employee Allegation Reporting Checklist regarding Smith, describing the allegation as "[h]itting multiple scholars with a yardstick during instructional time," and noting that an SRO report had been generated (Case No. 20250401). That same day, the District placed Smith on administrative leave with pay pending investigation, a status Smith acknowledged in writing.

50. Also on April 1, 2025, following a conference with Smith that lasted approximately thirteen minutes, Principal Holloway issued a recommendation that Smith receive, at bare minimum, only a five-day suspension, a letter of direction, and "any other professional consequence deemed appropriate," notwithstanding the video evidence Ms. Curtis had provided showing Smith striking, kicking, and threatening students. Area Superintendent Taylor's office disagreed with Holloway's recommendation and instead recommended a long-term suspension up to termination, together with a referral to the Georgia Professional Standards Commission for endangering students' safety.

51. On May 9, 2025, the Georgia Professional Standards Commission notified Ms. Curtis that it had opened Case No. 25-4-1700 regarding Smith and would conduct a full investigation into possible violations of the Code of Ethics for Educators. Smith's certification records

reflect that his certificate was suspended effective April 4, 2025, with the suspension continuing through February 4, 2026, in connection with that case. Smith did not return to Cedar Grove Middle School and, on information and belief, resigned his position.

52. The District's Department of Public Safety opened Case No. 202504010001 (Incident No. 25I000947) on April 1, 2025, identifying Smith as the offender, listing the offenses of simple battery, O.C.G.A. § 16-5-23, and cruelty to children in the second degree, O.C.G.A. § 16-5-70(c), and identifying Hutchinson as a person involved. The matter was forwarded to the Department's Criminal Investigations Division.

53. By Notice of Termination dated May 16, 2025, Superintendent Horton informed Hutchinson that the District had concluded an investigation of a report of employee misconduct and had determined that she failed to report child abuse, to render aid, and to cooperate in an Employee Relations investigation, and notified her that her employment was terminated.

**G. Retaliatory Bullying, Threats, and the District's Inadequate Response**

54. After Smith's removal from the classroom became known among students, many of whom favored Smith because of his popularity as a football coach, M.B. became the target of ostracism, harassment, and threats from fellow students who blamed her for reporting the abuse.

55. On April 17, 2025, Ms. Curtis notified Principal Holloway by text message that M.B. was being threatened with being "jumped" by students in her class. Holloway responded that the District would "begin investigating" and would follow up.

56. On April 30, 2025, M.B. was told by another student that a classmate had threatened to "stab [her] to death." Ms. Curtis immediately notified Holloway by text message and went to the school to remove M.B. Screenshots reflect that students, including seventh and eighth graders, were posting M.B.'s full name on social media alongside threats to "jump" her.

57. K.M. personally witnessed a fellow Cedar Grove student, a fifth-grader referred to in the family's communications with counsel as "Amira," state out loud in class that she and others intended to "beat up" M.B. because she was "snitching," explaining that Smith had been their favorite teacher and that they were angry once they realized why he was gone. This is a percipient, non-party witness account of the same retaliatory threats described in M.B.'s allegations above.

58. T.W. separately experienced retaliatory harassment for his own and his family's association with the reporting of Smith's conduct. Near the end of the 2024-2025 school year, two male students confronted T.W. in a school hallway, using profanity and demanding to know why he had "snitched." T.W.'s family, concerned for his safety amid the broader climate of threats directed at M.B. and others who had come forward, instructed him to avoid discussing the matter further at school in an effort to keep the situation from escalating.

59. M.B. also experienced differential and dismissive treatment from Cedar Grove staff after her role in reporting Smith became known. On multiple occasions, M.B. was ignored for up to fifteen minutes when she raised her hand in class, was denied permission to contact her mother when she felt unsafe, and was intentionally excluded from a group assignment

with her peers, notwithstanding her previously strong academic standing as a student in gifted classes and the National Beta Club.

60. Following the April 30, 2025 death threat, Ms. Curtis transitioned M.B. to virtual learning for the remainder of the 2024-2025 school year. M.B. was nonetheless required to report to Cedar Grove Middle School in person for standardized testing; May 7, 2025 was the last day M.B. physically attended Cedar Grove Middle School. On May 14, 2025, Ms. Curtis contacted Holloway seeking an update on M.B.'s virtual learning status, noting that M.B.'s coursework had been left unresolved during final exam week.

**H. Plaintiffs' Resulting Injuries**

61. As a direct and proximate result of Smith's physical abuse, the District's and its administrators' and employees' facilitation of and deliberate indifference to that abuse, and the retaliatory bullying and threats M.B. experienced afterward, M.B. suffered physical pain from being struck with a yardstick, and has suffered and continues to suffer severe emotional and psychological injury.

62. On May 7, 2025, M.B. underwent a psychological evaluation performed by David Kendis, PsyD, a licensed clinical psychologist. Based on clinical interview and standardized assessment instruments, including the Patient Health Questionnaire (PHQ-9), the Generalized Anxiety Disorder scale (GAD-7), and the PTSD Checklist for DSM-5 (PCL-5), M.B. was diagnosed with Post-Traumatic Stress Disorder and Major Depressive Disorder, single episode, moderate. M.B. scored 44 on the PCL-5 (a score of 33 or higher indicates symptoms consistent with a PTSD diagnosis), 12 on the PHQ-9 (indicating moderate depressive symptoms), and 16 on the GAD-7 (indicating severe anxiety).

63. Beginning May 31, 2025, M.B. began trauma-focused psychotherapy with a licensed therapist at NeuroMed USA, continuing through at least July 23, 2025, addressing symptoms including intrusive memories, hypervigilance, sleep disturbance, decreased appetite and motivation, and anxiety directly tied to the March Incident and its aftermath. M.B. has incurred medical and psychological treatment expenses in an amount of at least $11,194.02 to date, and may continue to incur such expenses.

64. M.B.'s injuries have caused, and continue to cause, significant impairment in her academic and social functioning, loss of enjoyment of life, and other general and special damages to be proven at trial.

65. As a direct and proximate result of Smith's physical abuse and the retaliatory harassment that followed, T.W. began individual psychotherapy at Success Brand Behavioral Health on May 26, 2025, after the abuse and the retaliation that followed his family's report of it came to light. At his intake evaluation, T.W. described being struck with a yardstick, being made to run laps as punishment, and being taken to a wooded area with no cameras, and the evaluating clinician documented a visible scar on his leg. The clinician recorded that T.W. was anxious and worried when discussing school, avoided areas of the school where he felt unsafe, had difficulty concentrating because of fear of classmates who blamed him for Smith's removal and had said they would "get him," and exhibited trauma-related distress, including fear, anxiety, and emotional numbness. The provider's diagnoses include child physical abuse, confirmed, and its treatment plan targets trauma from the physical abuse, bullying that followed the report, and stress related to the legal process. T.W. has attended approximately fifty sessions between May 26, 2025 and September 26, 2026, and remains in treatment.

66. K.M. suffered physical pain, which he described as moderate at the time, from being struck on the shoulder with a yardstick. K.M. and his family have not pursued medical or psychological treatment in connection with this incident.

## COUNT I

**42 U.S.C. § 1983 — Violation of Substantive Due Process**
**(Fourteenth Amendment — Right to Bodily Integrity)**
*(Against Defendant Smith, Individually)*

67. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

68. At all times relevant to this Complaint, Smith was acting under color of state law within the meaning of 42 U.S.C. § 1983, in his capacity as a teacher and coach employed by the District.

69. Students, including M.B., T.W., and K.M., have a clearly established substantive due process right under the Fourteenth Amendment to be free from the arbitrary, excessive, and conscience-shocking use of physical force by a public school employee acting under color of state authority. Neal v. Fulton Cnty. Bd. of Educ., 229 F.3d 1069, 1075-76 (11th Cir. 2000).

70. Smith's repeated striking of M.B., T.W., and K.M. with a wooden yardstick, together with his broader pattern of striking, kicking, and physically intimidating students as part of "Mr. Smith Games" and similar "games" in earlier school years, was not a good-faith effort to maintain discipline. It was obviously excessive in relation to any legitimate disciplinary purpose, was administered arbitrarily and for Smith's own amusement rather than in response to any genuine misconduct, created a foreseeable and unreasonable risk of serious

physical and psychological harm to each Plaintiff, and amounted to a brutal and inhumane abuse of Smith's official power that shocks the conscience.

71. Smith struck each Plaintiff maliciously, for punishment or his own amusement, and for no safety or instructional purpose. He struck M.B. because she lost a timed game, struck T.W. along with teammates as collective punishment for the conduct or losses of others, and struck K.M. because he laughed. None of them endangered anyone, and none had disobeyed a lawful instruction. Smith concealed what he was doing by covering his classroom door window, turning off the lights, taking players where there were no cameras, and telling students that recording was prohibited.

72. The most severe conduct was recorded. In one recording, Smith kicks a student in a plank position, strikes him with a yardstick, and tells him not to move or it would get worse. Each Plaintiff was subjected to the same practice, in which Smith used the yardstick to inflict pain as punishment.

73. Smith's conduct was intentional, willful, wanton, and/or in reckless disregard of each Plaintiff's clearly established constitutional rights.

74. As a direct and proximate result of Smith's conduct, M.B., T.W., and K.M. each suffered the physical and, as to M.B. and T.W., psychological injuries and damages described above.

## <u>COUNT II</u>

**42 U.S.C. § 1983 — Municipal/Board Liability**
**(Custom, Policy, or Practice; Failure to Train and Supervise)**
*(Against Defendants DeKalb County School District, DeKalb County Board of Education and Holloway in his official capacity)*

75. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

76. The District and the Board are each local governmental entities subject to suit under 42 U.S.C. § 1983, to the extent each is a separate legal entity, pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and its progeny. The Board, as the governing body of the school system, is the District's final policymaker for the matters alleged here.

77. The District, through its final policymakers and through a widespread custom and practice among Cedar Grove Middle School staff, tolerated, facilitated, and failed to prevent Smith's use of physical force against students as classroom discipline. That custom and practice included campus security personnel physically escorting students, including students not enrolled in Smith's class, to Smith's classroom for physical punishment, and at least one other classroom teacher directing misbehaving students to "Mr. Smith's class" as a known consequence.

78. This custom and practice was so widespread, longstanding, and open and obvious among students and staff at Cedar Grove Middle School that the District's final policymakers knew or, with the exercise of reasonable diligence, should have known of it, yet failed to train, supervise, or discipline staff to prevent it.

79. Before March 31, 2025, the custom had existed for at least a school year and involved multiple District employees. T.W. was struck by Smith in the fall of 2024 and had been in Smith's class during the 2023-2024 school year. A football player has told Public Safety that during the prior football season a campus supervisor took him from his own class to Smith's room, where Smith made him and others do push-ups and sit-ups. Hutchinson

regularly escorted football players to Smith; at least one teacher told students they would be sent to "Mr. Smith's class"; and a health teacher and assistant coach sent players to Smith.

80. On information and belief, Holloway, the principal and the District's on-site decisionmaker, was personally present on occasions before March 31, 2025 when Smith yelled at students in his classroom.

81. The Board is the District's final policymaker for personnel policy and student discipline, including the prohibition of corporal punishment, and it delegated to the Superintendent and school principals the day-to-day enforcement of those policies and the supervision of employees. Superintendent Horton received Ms. Curtis's formal written complaint, with video and audio evidence, on March 31, 2025.

82. The District's failure to train and supervise its administrators, campus security personnel, and teachers regarding the use of physical force against students, and regarding the obligation to report suspected child abuse under Georgia's mandatory reporting statute, O.C.G.A. § 19-7-5, amounted to deliberate indifference to the constitutional rights of students, including M.B., T.W., and K.M., and reflects a policy or custom for which the District is liable.

83. The District's own findings confirm that its personnel failed to protect students. The District issued Hutchinson a Notice of Termination citing, among other things, her failure to report child abuse and render aid, and its Area Superintendent recommended Smith's long-term suspension up to termination and a referral to the Professional Standards Commission for endangering students' safety. Those determinations, however, followed

only after a parent, and not any District employee, reported Smith's conduct and supplied video evidence.

84. The District's failure to enforce its own written policies, described above, including its policy limiting physical contact with students to situations of immediate danger and its requirements for training and recordkeeping, reflects deliberate indifference to the risk that Smith and others would use physical force on students outside any lawful basis.

85. The District's inadequate response to the March 31, 2025 complaint, including Principal Holloway's recommendation of only a five-day suspension notwithstanding video evidence of Smith striking and kicking students, and the District's failure to adequately protect M.B. from foreseeable retaliatory bullying and threats after she came forward, further reflect a policy, practice, or custom of deliberate indifference to the safety and constitutional rights of students who report staff misconduct.

86. As a direct and proximate result of the District's policies, customs, and practices, and its deliberate indifference, M.B., T.W., and K.M. each suffered the injuries and damages described above.

## **<u>COUNT III</u>**

**42 U.S.C. § 1983 — Supervisory Liability and Deliberate Indifference**
*(Against Defendant Holloway, Individually and Officially)*

87. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

### **<u>A. Pre-Injury Supervisory Theory (All Plaintiffs)</u>**

88. As Principal of Cedar Grove Middle School, Holloway had supervisory authority and responsibility over Smith, a teacher and coach in his building, and over the safety of students, including M.B., T.W., and K.M., while on school grounds. Although Hutchinson reported through the District's Department of Public Safety, on information and belief Holloway directed or approved the escorting of students to classrooms in his building and was responsible for responding to and reporting suspected abuse there.

89. Holloway knew, or in light of the open and widespread nature of the practice among students and staff, including his own campus supervisor's participation in escorting students to Smith's classroom for physical discipline, his own past presence while Smith yelled at and disciplined students, and at least one other teacher's practice of sending football players to Smith's classroom for the same purpose, should have known, of Smith's pattern of physically abusing students well before March 31, 2025, yet failed to investigate, intervene, or take corrective action.

90. Holloway's own account to the District's Department of Public Safety, that he understood campus supervisors had escorted football players to Smith's classroom because Smith was the football coach, reflects that Holloway regarded sending players to Smith's classroom with a campus supervisor as an ordinary and explicable practice, and that he failed to inquire into what occurred once students arrived there.

91. Had Holloway inquired into what happened when campus supervisors and teachers delivered students to Smith's classroom, or into the yelling he had witnessed, he would have discovered Smith's practice and could have stopped it before T.W. was struck in the

fall of 2024 and before M.B. and K.M. were struck in early 2025. His inaction was a but-for and proximate cause of each Plaintiff's injury.

**B. Post-Report Failure to Protect (M.B.)**

92. After being placed on direct notice of Smith's conduct through Ms. Curtis's March 31, 2025 written complaint and accompanying video evidence, and after receiving T.W.'s written witness statement, Holloway responded with deliberate indifference by recommending only a minimal five-day suspension for conduct that plainly endangered student safety, and by failing to make time to meet with T.W. about his statement.

93. After M.B. reported specific, credible threats of violence against her, including an explicit threat to "stab [her] to death," arising directly from her role in reporting Smith, Holloway failed to take reasonably adequate steps to investigate or protect M.B. from foreseeable retaliatory harm, notwithstanding his position and ability to do so.

94. Measures reasonably available to Holloway after M.B.'s mother reported the threats, and on information and belief not implemented, included promptly interviewing and disciplining the students who made them, contacting their parents, adopting a written safety plan, adjusting M.B.'s schedule or escorts, directing teachers to let M.B. contact her mother, and notifying the school resource officer. Holloway's responses, that the school would begin investigating on April 17, 2025 and that he was "on it" on April 30, 2025, were not followed by any such measure, and M.B. was withdrawn from school on April 30, 2025 for her safety.

95. Holloway's failures reflect a causal connection between his own conduct and the constitutional violations each Plaintiff suffered, and constitute deliberate indifference to a known and obvious risk of harm to Plaintiffs' constitutional rights and physical safety.

96. As a direct and proximate result of Holloway's conduct, M.B., T.W., and K.M. each suffered the injuries and damages described above.

## COUNT IV

**42 U.S.C. § 1983 — Failure to Intervene / Integral Participation**
*(Against Defendant Hutchinson, Individually)*

97. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

98. As a campus supervisor at Cedar Grove Middle School, Hutchinson had a duty, under clearly established law, to intervene to prevent the use of excessive and constitutionally unlawful force against students by another school employee when in a position to do so.

99. Hutchinson routinely escorted students, including T.W.'s and K.M.'s football teammates who were not enrolled in Smith's class, to Smith's classroom for physical discipline, and was present, on at least one occasion documented by video evidence reviewed by the District and independently described by T.W., in the classroom while Smith struck and yelled at students, yet failed to intervene, stop the abuse, or report it.

100. Hutchinson observed Smith striking, kicking, and yelling at students while standing in the classroom. As a campus supervisor responsible for student safety, she had authority and a realistic opportunity to intervene, including by ordering Smith to stop, removing students from the room, summoning an administrator or the school resource officer, and reporting

the abuse to the Department of Family and Children Services or law enforcement as O.C.G.A. § 19-7-5 required. She took none of those steps.

101. Hutchinson’s conduct was an integral part of Smith’s constitutional violations and independently reflects a reckless or deliberately indifferent disregard for the constitutional rights and physical safety of students, including M.B., T.W., and K.M.

102. The District itself determined, following an investigation, that Hutchinson failed to report child abuse, failed to render aid, and failed to cooperate in its Employee Relations investigation, and issued her a Notice of Termination dated May 16, 2025. That determination confirms that Hutchinson's presence at and facilitation of Smith's abuse was not a good-faith exercise of her duties.

103. As a direct and proximate result of Hutchinson’s conduct, M.B., T.W., and K.M. each suffered the injuries and damages described above.

## COUNT V

**Assault**
*(Georgia Law — Against Defendant Smith, Individually)*

104. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

105. M.B. saw Smith, yardstick in hand, strike her on the hand, then walk around the room striking other students, and then return toward her, placing her in reasonable apprehension of immediate harmful contact before he struck her a second time on the leg.

106. K.M. was in a class period in which Smith struck at least three other students with a yardstick before striking K.M., and K.M. saw Smith carrying the yardstick and moving among students, placing him in reasonable apprehension of immediate harmful contact.

107. T.W. was taken with teammates to an area behind the school, out of sight of cameras, by Smith, who made them run and then struck their shins; T.W. understood he and the others were about to be struck, which placed him in reasonable apprehension of immediate harmful contact.

108. Smith's conduct was intentional and without legal justification or privilege.

109. As a direct and proximate result of Smith's conduct, M.B., T.W., and K.M. each suffered the injuries and damages described above.

## <u>COUNT VI</u>

**Battery**
*(Georgia Law — Against Defendant Smith, Individually)*

110. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

111. Smith intentionally made harmful and offensive physical contact with each Plaintiff without consent and without legal justification or privilege: with M.B., by striking her with a wooden yardstick on her hand and leg; with T.W., by striking his shin with a yardstick and, on a separate occasion, forcing him into a prolonged "wall sit" as punishment; and with K.M., by striking his shoulder with a yardstick.

112. None of this force was justified. No Plaintiff presented any danger to Smith or anyone else when struck: M.B. had lost a classroom game and was seated; T.W. was punished along

with teammates for the misconduct of others or for the team's losses; and K.M. had laughed during an exercise. Smith used a yardstick, was not acting in self-defense or to restrain anyone, and had no lawful authority to punish students physically. Smith's claim that parents had signed off on his methods was false, and no Plaintiff's parent or guardian authorized or consented to physical punishment.

113. As a direct and proximate result of Smith's conduct, M.B., T.W., and K.M. each suffered the injuries and damages described above.

## COUNT VII

**Intentional Infliction of Emotional Distress**
*(Georgia Law — Against Defendant Smith, Individually)*

114. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

115. Smith's conduct toward M.B. and T.W., each a child under his instructional and/or coaching care and authority, including repeatedly and deliberately striking them and other students under the guise of "games," was extreme and outrageous, exceeding all bounds of decency ordinarily tolerated in a civilized community, particularly given the inherent power imbalance and trust between a teacher and coach and young students.

116. Smith's conduct was intentional or, at minimum, in reckless disregard of the high probability that it would cause M.B. and T.W. severe emotional distress.

117. M.B.'s distress was severe. After being struck and then threatened and ostracized for reporting it, M.B. was diagnosed with Post-Traumatic Stress Disorder and Major Depressive Disorder, with a PTSD checklist score of 44 and a GAD-7 score of 16 (severe

anxiety). She suffered intrusive thoughts, an exaggerated startle response, sleep disturbance, loss of appetite and interest in activities, withdrawal from friends and school, and fear for her safety, and she received weekly trauma-focused psychotherapy from May 31 through July 23, 2025. Her distress was caused by Smith's abuse and by the retaliation that foreseeably followed her reporting it.

118. T.W.'s distress was likewise caused by Smith's abuse and the retaliation that followed. T.W. began individual psychotherapy in May 2025 and his provider's diagnoses include child physical abuse, confirmed, and its treatment plan targets trauma from the physical abuse, bullying that followed the report, and stress related to the legal process. T.W. has attended approximately fifty sessions between May 26, 2025 and September 26, 2026, and remains in treatment.

## COUNT VIII

**Negligent Retention, Supervision, and Training**
*(Georgia Law — Against Defendants DeKalb County School District and DeKalb County Board of Education)*

119. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

120. The District owed a duty to M.B., T.W., K.M., and other students to exercise reasonable care in the training, retention, and supervision of its employees, including Smith and Hutchinson, and to take reasonable steps to prevent foreseeable harm to students in its care. Plaintiffs do not allege negligent hiring.

121. Before each Plaintiff was injured, the District knew or, through the exercise of reasonable diligence, should have known of Smith's propensity to strike and physically punish

students. By the time T.W. was struck in the fall of 2024, and again by the time M.B. and K.M. were struck in early 2025, the practice had gone on in the open for at least a school year; campus supervisors were escorting students to Smith's classroom for discipline; at least two other staff members were sending players to Smith; Smith was disciplining students in a manner students openly called "Smith games"; and Holloway was, on information and belief, personally present when Smith yelled at students. The District nonetheless failed to supervise Smith's classroom and coaching, failed to train and monitor campus supervisors on the use of force and the duty to report suspected abuse, and retained Smith in the classroom and as football coach.

122. As a direct and proximate result of the District's negligence, M.B., T.W., and K.M. each suffered the injuries and damages described above.

## COUNT IX

**Negligence — Failure to Protect from Foreseeable Retaliatory Harm**
*(Georgia Law — Against Defendants DeKalb County School District, DeKalb County Board of Education and Holloway, officially)*

123. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

124. The District owed M.B. a duty of reasonable supervision and protection while she was in its care and custody as a student, including protection from foreseeable harm by other students.

125. After M.B. reported credible threats of violence, including an explicit threat to "stab [her] to death," made in direct retaliation for her role in reporting Smith's abuse, the District knew of a specific and foreseeable risk of serious harm to M.B.

126. On April 17, 2025, Ms. Curtis texted Holloway that M.B. was being threatened with being "jumped" by students in her class, and Holloway replied that the District would begin investigating and follow up the next day. On April 30, 2025, Ms. Curtis texted Holloway the threat to "stab [her] to death," along with screenshots of social-media posts, and Holloway replied that he was on it. On information and belief, the District did not, in the days that followed, implement any effective safety plan for M.B. On May 14, 2025, Holloway told Ms. Curtis only that he would call her soon, and M.B. remained without an alternative instructional arrangement during final exams.

127. Those responses were inadequate. Measures reasonably available to the District, and on information and belief not implemented, included promptly interviewing and disciplining the students who made the threats and contacting their parents; a written safety plan for M.B.; adjusting her schedule, seating, or escorts; directing teachers to allow M.B. to contact her mother when she felt unsafe; monitoring the social-media threats for which screenshots were provided; and notifying the school resource officer or Public Safety.

128. The District breached its duty of reasonable care by failing to take the measures described above to address or prevent the continuing threats and bullying directed at M.B., necessitating her withdrawal from in-person instruction.

129. As set forth in Count VIII, to the extent the District possesses applicable liability insurance coverage, its sovereign immunity is waived to the extent of that coverage.

130. As a direct and proximate result of the District's negligence, M.B. suffered the injuries and damages described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally where applicable, and award the following relief:

a. Compensatory damages in an amount to be determined at trial, including but not limited to damages for physical pain and suffering, past and future medical and psychological treatment expenses, emotional distress, mental anguish, and loss of enjoyment of life;

b. Punitive damages against the individual Defendants, in their individual capacities, to the extent permitted by law, for conduct shown to be willful, wanton, or in reckless disregard of Plaintiffs' rights;

c. Reasonable attorneys' fees and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law;

d. Pre-judgment and post-judgment interest as allowed by law;

e. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Respectfully submitted this 26th day of October, 2026.

CHENNAULT LEGAL AND CONSULTING GROUP, LLC

/s/ Kianna Chennault
Kianna Chennault, Esq.
Georgia Bar No. 952110
1400 Veterans Memorial Highway SE, Suite 134-252
Mableton, GA 30126
(470) 368-9787

kianna@chennaultlaw.com
Attorney for Plaintiffs